UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

FOR PUBLICATION

-------------------------------------------------------------------------x

In re:                                                         :

PEGGY NESTOR,                                       :    Chapter 11

                                                                  :    Case No. 23-10627 (MEW)

                      Debtor.                           :

-------------------------------------------------------------------------x

ALBERT TOGUT, Not Individually But Solely In His    :
Capacity as Chapter 11 Trustee,                          :

                      Plaintiff,                          :    Adv. Pro. No. 25-01037 (MEW)

                      -v.-                                  :

PEGGY NESTOR, MARIANNE NESTOR CASSINI,    :
BRENDA NESTOR and GEMEAUX LTD.,            :

                      Defendants.                      :

-------------------------------------------------------------------------x

## DECISION AFTER TRIAL RESOLVING DISPUTES AS TO WHETHER CERTAIN ITEMS ARE FIXTURES OR ARE PERSONAL PROPERTY

On June 26, 2025, I completed a trial to resolve disputes as to whether certain items located in the building at 15 East 63d Street, New York, NY (the "**Townhouse**") should be treated as personal property or as fixtures. The trial record incorporates the transcript of a personal visit to the Townhouse that I made on June 5, 2025 with the parties and their representatives. *See* Ex. V. The list of disputed items is set forth in an Exhibit that is in evidence. *See* Ex. A. A separate list of items that were originally designated as disputed items, but that the parties have been unable to locate and to identify within the Townhouse, is set forth in Trustee's Exhibit B. My rulings as to the disputed items are explained below.

## Background

It is necessary, as background to this Decision, to summarize the history of this bankruptcy case and of various adversary proceedings that have been filed.

Peggy Nestor (the "**Debtor**") commenced this case by filing a voluntary chapter 11 petition on April 25, 2023. She represented in her papers that the Townhouse was her primary asset. The recorded deed states that the Debtor and her sister, Marianne Nestor Cassini, are co-owners of the Townhouse. However, the Debtor claimed in her petition and supporting papers that her sister had transferred her interest to the Debtor in 2016 and that the Debtor was the sole owner of the Townhouse. *See* Declaration of Debtor Pursuant to Local Bankruptcy Rule 1007-2, ECF No. 2, at ¶ 3.[1] The Debtor also represented under oath that her sister "never resided in the Townhouse" and had not paid the mortgage or related expenses. *Id.*

Marianne Nestor Cassini is the former wife of Oleg Cassini. She has been involved in a long-running estate battle with other heirs of Mr. Cassini that continue to be the subject of proceedings in the Surrogate's Court in Nassau County. ECF No. 58. In 2014, the Surrogate's Court removed Marianne Nestor Cassini as executor of Mr. Cassini's estate and appointed the Nassau County Public Administrator as her successor. *Id.* at ¶ 16. The Public Administrator and the court-appointed Receiver contend that they have enforceable security interests in the Townhouse by virtue of (a) a judgment lien in the amount of $1,041,336 that was entered against Marianne Nestor Cassini in 2015 and that applies to the extent of Ms. Nestor Cassini's interest in the Townhouse, and (b) an attachment order issued by the Surrogate's Court in 2020 (affirmed in 2021) that covers up to $2,594,813.42 in value of the Debtor's interests and up to $57 million of any interests that Marianne Nestor Cassini holds in the Townhouse and in any other real or

---

[1]    Citations to "ECF" are to the docket in the main bankruptcy case (23-10627). Citations to "AP ECF" are to the docket in adversary proceeding 25-01037. Citations to the dockets in other adversary proceedings are identified, in each case, by references to those separate adversary proceeding numbers.

personal property.  *Id.* at ¶¶ 25, 29.  The 2020 attachment order post-dates the unrecorded 2016

deed that the Debtor previously identified in her papers.

Two financial institutions also hold mortgage liens.  Emigrant Bank (as successor to

Emigrant Savings Bank-Manhattan) has asserted a claim in the amount of $3,559,407.76 that is

secured by a mortgage lien on the Townhouse.  *See* Claims Register, Item 5-1.  Lynx Asset

Services, LLC also holds a mortgage lien that was granted by the Debtor and Ms. Nestor Cassini

in support of their personal guarantees of a loan that was made to an entity named Gemeaux Ltd.

*See* ECF No. 47.

The New York State Court entered a foreclosure judgment in favor of Lynx and against

the Debtor and Ms. Nestor Cassini on October 12, 2022.  ECF 48-8, Exhibit H.  A pending

foreclosure sale, pursuant to that judgment, prompted the Debtor's bankruptcy filing in 2023.

ECF No. 2, ¶¶ 8, 12.

Throughout the early months of this case the Debtor and her counsel continued to

represent that the Debtor was the sole owner of the Townhouse.  In her Schedules of Assets and

Liabilities filed on May 12, 2023, for example, the Debtor represented under oath that the

Townhouse was "Jointly Held – subject to transfer in 2016" and that "Interest of co-owner

signed over in or about 2016; Deed unrecorded."  *See* Schedule A/B¸ ECF No. 21, Part 1, § 1.1.

Similar representations were made in other pleadings.  *See, e.g.,* ECF No. 23, ¶ 6; ECF No. 24,

Application ¶ 6; ECF No. 37, ¶ 7.  The Debtor also filed a tentative plan of reorganization that

contemplated a refinancing or sale of the Townhouse and that provided that all interests of

Marianne Nestor Cassini in the Townhouse (if there were any) would be extinguished.  ECF No.

62, Articles V, X.  The draft Disclosure Statement that the Debtor filed with the proposed plan

stated:

> The Debtor's case is complicated by the fact that the Debtor's sister, Marianne, holds a *[sic]* interest in the Home, at east *[sic]* on "paper." Marianne is titled on the deed to the premises as a joint tenant in common even though she never resided there or contributed to the expenses associated with it. The Debtor maintains that Marianne's interest was transferred to her and that, regardless, her interest in the Townhouse is far greater than 50% in that she paid expenses relating to the Townhouse for decades.

*See* ECF No. 63, at 5.

The Debtor initially indicated a desire to refinance the Lynx mortgage debt, and possibly other mortgage debts, but she never was able to do so. The Debtor's counsel represented that the existence of the attachment lien was an obstacle to such a refinancing. ECF No. 37, ¶ 8. The Debtor then sought permission to retain Sotheby's as a broker in order to pursue a sale of the Townhouse. ECF No. 66. Efforts to sell the Townhouse could have been adversely affected if there were uncertainties as to who owned the property, so in order to address that issue the Debtor commenced an adversary proceeding (Adv. Pro. No. 23-01195) against Marianne Nestor Cassini, the Public Administrator and the Receiver, seeking a declaration that the Townhouse belongs only to Peggy Nestor and that Marianne Nestor Cassini has no ownership interest in it. In the alternative, the Debtor asked for an Order declaring that the Townhouse could be sold pursuant to section 363(h) of the Bankruptcy Code, which permits the sale of property that is jointly owned by a debtor and another person so long as certain conditions are satisfied. *See* 11 U.S.C. § 363(h).

The parties agreed in late 2023 that the Townhouse would be sold and they agreed on the procedures that would govern the sale, and I approved those procedures on December 15, 2023. ECF No. 78. I also approved the retention of Sotheby's as a broker. ECF No. 77. Marianne Nestor Cassini signed the engagement letter with Sotheby's for the sale of the Townhouse, but she added a note stating "all rights reserved  nothing herein is an admission of any ownership interest. Peggy Nestor is the owner of 15 E. 63rd Street." ECF No. 80.

The Public Administrator and the Receiver filed answers in the adversary proceeding that the Debtor had filed, reserving their rights to claim that the Townhouse belongs, in whole or in part, to Marianne Nestor Cassini.  Adv. Pro. No. 23-01195, ECF Nos. 7 & 8.  However, Marianne Nestor Cassini did not oppose the relief sought in the Complaint.  Instead, on January 31, 2024, she filed an admission of service of the Summons and Complaint, and stated "I acknowledge that I have no ownership interest in the premises at 15 East 63th [*sic*] Street, New York. NY. 10065.  Peggy Nestor is the Sole Owner of 15 East 63rd Street."  *See* Adv. Pro. No. 23-01195, ECF No. 10, at ¶ 8.

Thereafter, Peggy Nestor asked for the entry of judgment against Marianne Nestor Cassini in the pending adversary proceeding.  Adv. Pro. No. 23-01195, ECF No. 11.  The request for the entry of the judgment was not opposed by any party.  At a hearing on March 5, 2024, all parties agreed that the Court should approve the sale of the Townhouse pursuant to section 363(h), with the understanding that the creditors' issues as to whether Marianne Nestor Cassini owns an interest in the Townhouse would be resolved in connection with the allocation of the proceeds of a sale.  I therefore entered an Order granting a partial judgment against Ms. Nestor Cassini on March 13, 2024, confirming that the Townhouse would be sold pursuant to the sale procedure previously approved by the Court.  Adv. Pro. No. 23-01195, ECF No. 18.

A motion for the appointment of a chapter 11 trustee was also scheduled for hearing on March 5, 2024.  Marianne Nestor Cassini appeared at that hearing, and she also filed papers shortly before the hearing stating her belief that a trustee should not be appointed.  In her filing, Ms. Nestor Cassini stated that "Oleg Cassini, my husband since 1971, has had no Ownership Interest in the town house at 15 East 63rd Street NYC 10065.  It is the residence and sole property of Peggy Nestor."  ECF No. 104, at ¶ 38.  Ms. Nestor Cassini also stated that "15 East

63rd Street, has been Peggy's Home and Primary Residence for 40 years. I have never resided there. The building is 100% owned by Peggy since 2018, by Deed." *Id*. at ¶ 64.

I determined that the appointment of a Trustee was warranted for the reasons stated in a Decision dated March 13, 2024. ECF No. 106. One reason was that certain assets had apparently been diverted. Another reason was that the sale of the Townhouse had not been proceeding in accordance with the agreed schedule. *Id.* Albert Togut Esq. was appointed as the Chapter 11 trustee on March 22, 2024. ECF Nos. 111, 112.

The Trustee, following his appointment, was entitled to take control of property of the Debtor's estate. However, the Debtor, her sister and other family members did not cooperate in making the Townhouse available to the Trustee. The Trustee filed an adversary proceeding on April 10, 2024, stating that his access to the property had been denied. He also stated that he had been advised that the Debtor resided in Connecticut and not at the Townhouse, and that he had also been advised that Marianne Nestor Cassini never resided at the Townhouse. Complt., Adv. Pro. No. 24-01342, ECF No. 1, ¶¶ 11, 28. I issued an Order to Show Cause that same day that directed Peggy Nestor and Marianne Nestor Cassini to show cause at a hearing on April 23, 2024, as to why an Order should not be entered directing them to surrender and turn over possession of the Townhouse to the Trustee. *Id.,* ECF No. 3. The Debtor and Ms. Nestor Cassini did not file responsive papers and did not appear at the April 23, 2024 hearing. The Debtor's counsel of record appeared by telephone at the hearing and reported that she had attempted to communicate with the Debtor but had been unable to get a response from the Debtor despite concerted efforts. *See* Tr., April 23, 2024, Adv. Pro. No. 24-01342, ECF No. 10 at 8:10-17. The Debtor's counsel also reported that she had spoken with Marianne Nestor

Cassini, and that Ms. Nestor Cassini had not stated that she opposed the Trustee's request for relief. *Id*. at 8:18-9:2.

I entered an Order on April 23, 2024 that compelled the Debtor and Ms. Nestor Cassini to provide access to the Townhouse to persons designated by the Trustee. *Id.*, ECF No. 8. I stated in the Order that the Townhouse was to be in the sole custody of the Trustee and that, if it turned out to be necessary, the Trustee was authorized to use the assistance of the U.S. Marshals' Service to facilitate the Trustee's entry into the Townhouse "and to remove any occupants found there." *Id*.

The Trustee filed proofs of service of the Order upon the defendants. *Id*., ECF No. 9. The Debtor and her sister did not turn over keys to the Trustee and did not do the other things I had directed them to do. The Trustee attempted to get access to the Townhouse on April 26, 2024, but access was refused by the persons who were then in the house. On April 29, 2024, the Debtor's counsel filed a motion to withdraw as the Debtor's attorney, and represented that the Debtor "is no longer directly responding to counsel's communications and is not cooperating with the Trustee." ECF No. 129 at ¶ 6.

Ms. Nestor Cassini sent emails to Chambers and left voice mail messages on Friday, April 26 and Monday, April 29, but she was told that *ex parte* communications were not permitted and that any requests for relief had to be filed with the Clerk with notice to other parties. On April 29, the Clerk's Office received letters from Peggy Nestor, Marianne Nestor Cassini and Gemeaux Ltd. that were dated April 27, 2024 and that asked for a stay of proceedings so that new counsel could be obtained. *Id.,* ECF Nos. 130-132. These documents were not entered on the docket until April 30, 2024. In the meantime, the Trustee had returned to the Townhouse with members of the U.S. Marshals Service, who forced their way into the

building and evicted Peggy Nestor, Marianne Nestor Cassini and their niece from the premises.
ECF No. 135.

I held a conference on May 1, 2024 to address the letters that Peggy Nestor and Marianne
Nestor Cassini had filed and to address their requests for a stay while they obtained new counsel.
*See* Tr., May 1, 2024, ECF No. 166. At the conference, the Trustee described the events that led
to the eviction. *Id.* 6:17-10:5. Ms. Nestor Cassini then contended, for the first time, that she
actually continues to be a one-half owner of the Townhouse and that the Trustee should not be
permitted to take possession of her property. *Id.* at 40:1-44:6. The Debtor and Ms. Nestor
Cassini had previously made explicit representations to the contrary, which were important
elements in my prior denials of stay relief to Lynx and in support of Peggy Nestor's asserted
efforts to arrange a refinancing and sale  The prior representations also were important elements
in my decision to limit requests by the Public Administrator and the Receiver for relief from the
automatic stay to enforce their own asserted interests in the Townhouse. I held at the May 1,
2024 hearing that Ms. Nestor Cassini was estopped from taking a different position in light of the
explicit prior representations she had filed with the Court, *id.* at 45:10-46:15, 78:16-79:3, and I
confirmed that ruling in a written decision that I entered following another conference held on
May 8, 2024. ECF No. 153.

Ms. Nestor Cassini also argued at the May 1 hearing that she had not been aware of the
various orders that I had entered or of the adversary proceeding that the Trustee had filed. Tr.
ECF No. 166 at 48:24-52:17. I noted that over the prior weekend Ms. Nestor Cassini had left
messages on the voice-mail system for chambers complaining about my orders and about the
Trustee's efforts to get access to the property, so that she obviously had knowledge of what was

happening.  The Trustee also verified that service had been completed and that proofs of service had been filed.  *Id.* at 68:21-69:7.

Since April 2024 the Trustee has attempted to find a buyer for the Townhouse.  The Debtor and her sister have repeatedly sought to dismiss the chapter 11 case or otherwise to oppose the Trustee's efforts on a variety of grounds.  I have carefully considered their requests and have denied them for reasons I have stated in other decisions.  The Debtor and Ms. Nestor Cassini have also denied ever having represented that Peggy Nestor was the sole owner of the property, notwithstanding the many instances (as recounted above) in which those express statements appear on the docket.

## The Fixtures Issues

On February 4, 2025, the Trustee filed a motion to establish procedures for the disposition of various items of personal property located in the Townhouse.  ECF No. 508.  During a hearing on February 13, 2025, which had been scheduled to address other matters, Marianne Nestor Cassini contended that all of the items of personal property located on the fifth and sixth floors of the Townhouse belong to another sister, Brenda Nestor.  *See* Tr., Feb. 13, 2025, 13:4-6, 13:22-14:2 (ECF No. 539).  Ms. Nestor Cassini also claimed that she had personally purchased various items of personal property at the time the Townhouse was purchased; that these items were appraised at the time and were treated as personal property (not real property) under the sale documents; and that these items should continue to be treated as her personal property.  *Id*. at 13:6-13, 14:4-15:6, 18:12-16

The Trustee's motion came on for hearing on February 27, 2025.  *See* Tr., Feb. 27, 2025, ECF No. 551.  I noted at the hearing that a motion was not the proper way to resolve potential issues as to the ownership of personal property and that such issues should be resolved by the

commencement of an adversary proceeding.  *Id*. at 22:4-16, 24:8-15.  Marianne Nestor Cassini

again asserted her ownership of various items that were subject to a separate bill of sale as part of

the original closing and again contended that other items belonged to Brenda Nestor.  *Id*. at

29:22-32:14.

On March 3, 2025, the Trustee filed the above-captioned adversary proceeding.  He

named Peggy Nestor, Marianne Nestor Cassini, Brenda Nestor and Gemeaux Ltd. (the company

jointly owned by Peggy Nestor and Marianne Nestor Cassini) as defendants, and sought a

declaration that all items contained in the Townhouse constitute property of the bankruptcy

estate of Peggy Nestor.  I held a scheduling conference on March 12, 2025, at which Peggy

Nestor, Marianne Nestor Cassini and attorneys for Brenda Nestor appeared.  *See* Tr., Mar. 12,

2025 (AP ECF No. 14.)  Ms. Nestor Cassini again asserted that all items on the fifth and sixth

floors of the Townhouse belong to Brenda Nestor or possibly to one or both of Brenda Nestor's

daughters.  *Id*. at 15:23-16:1.  She also repeated her contention that she had separately bought

some items when the Townhouse was originally purchased and that these should be treated as

her personal property.  *Id.* at 16:1-5.

The parties confirmed on March 12, 2025 that the Trustee would permit supervised visits

to the Townhouse so that the defendants could identify any items that they believed were theirs.

*Id.* at 26:3-20, 27:9-22, 28:23-29:11, 39:5-13.  I also noted that Brenda Nestor's daughters had

not been named as defendants, but the parties suggested (and the Court agreed) that in lieu of

doing so it would suffice if the two daughters were to file acknowledgments that they do not

claim interests in any of the items at the Townhouse.  *Id.* at 22:4-8, 29:17-31:1, 32:20-33:4.  The

two daughters thereafter filed letters disclaiming any interest in such items.  ECF Nos. 8, 9.

Subsequently, the Trustee moved to narrow the parties' disputes.  He filed a motion for

an Order authorizing him to abandon his interests in most of the items of personal property in the

Townhouse but to retain his claims as to certain artwork that Peggy Nestor had listed as

belonging to her, and also as to items that the Trustee believes are "fixtures" under New York

law.  AP ECF No. 17.  I granted the motion to abandon the uncontested items by Order entered

May 13, 2025.  AP ECF No. 41.  The Order approved the procedures by which the Trustee will

notify the above-named defendants of their opportunity to remove items that the Trustee agrees

constitute personal property, and it provides that any items that are not removed pursuant to the

agreed procedures will be deemed to have been abandoned to the bankruptcy estate.  *Id.*

The disputed issues relate to the items that the Trustee believes are fixtures.  The Trustee

has the right to sell any property belonging to the Debtor (regardless of whether it is real or

personal property), and so the fixtures issue is not relevant to the Trustee's right to sell the

Debtor's property.  Marianne Nestor Cassini is the only defendant who has filed an answer to the

Complaint and who has asserted a competing ownership interest in any of the items that the

Trustee believes are fixtures.  I have previously held (and have reaffirmed on countless

occasions) that Ms. Nestor Cassini is estopped from claiming an ownership interest in the real

property.  To the extent the disputed items are fixtures they are part of the Townhouse, and Ms.

Nestor Cassini is estopped from claiming an interest in them.  However, I have also held that Ms.

Nestor Cassini's prior statements about the ownership of the Townhouse did not address

personal property, and so they do not bar her from claiming ownership of items that are personal

property and that do not constitute fixtures.  The fixtures issues therefore are directly relevant to

Ms. Nestor Cassini.

The Trustee filed a motion for summary judgment and various supporting papers on April 8, 2025. AP ECF Nos. 18-21. At a hearing on May 8, 2025, I stated that the summary judgment papers had not addressed all of the disputed items and therefore that summary judgment would not be proper. *See* Tr., May 8, 2025, ECF No. 40, 16:11-25, 17:16-19:3. I questioned Ms. Nestor Cassini at that time about the disputed items but could not obtain clear answers as to whether she agreed that any of them constituted fixtures. It appeared at that time that Marianne Nestor Cassini was only claiming ownership of those items that had been covered by a separate bill of sale at the time the Townhouse was purchased. Ms. Nestor Cassini acknowledged that all of the items on the relevant bill of sale had already been in the Townhouse at the time of the purchase. *Id.* at 25:11-30:11. She argued, however, that all of the items could be removed, that she had paid for them herself, and therefore that they should be treated as her personal property. *Id*.

I stated at the May 8 hearing that we would have a trial to resolve the disputes as to the items that the Trustee believes are fixtures. I also stated (and the parties agreed) that as part of that process I would visit the Townhouse to inspect all of the disputed items. *Id*. at 39:20-40:12. We performed that inspection on June 5, 2025, and a court reporter prepared a video transcript of the inspection, including the parties' comments regarding each item. During the inspection Ms. Nestor Cassini identified additional items that she believed should be treated as personal property and not as fixtures. I confirmed at that time, and the parties agreed, that the transcript of the inspection would be considered part of the trial record.

I completed the trial on June 26, 2025, at which time I received live testimony by the Trustee's expert witness (Jared Sarnowski) and by Ms. Nestor Cassini. I also received a number of exhibits into evidence, which included the transcript of prior deposition testimony by Ms.

Nestor Cassini (Ex. W), which I have reviewed before preparing this Decision.  A separate

exhibit (Ex. O) shows changes to the original lists of disputed items that were made after the site

visit was completed.  The final lists of disputed items are set forth in Trustee Exhibits A and B.

### New York Law as to Fixtures

A fixture is an item of personal property that has been annexed to real property in such a

manner, and with such an intent, that it loses its character as personal property and becomes part

of the real property itself.  5 Warren's Weed New York Real Property § 56.01.  "Once personalty

becomes a fixture, it loses its identity as distinct personal property and its nature becomes that of

real property."  *Id*.; *Mott v. Palmer*, 1 N.Y. 564, 570 (1848) (the "legal nature" of personal

property used to construct a fence or a building is changed and it "becomes real estate").

New York courts have long considered three factors in determining whether an item is a

fixture: (1) the degree to which an item has been annexed to real property, (2) whether the item

was built for use in specific realty or whether the realty was built specifically to house the item,

so that its removal would reduce the value of the realty; and (3) whether the party who annexed

the personal property to the realty intended to make it a permanent part of the realty.  *See Matter

of City of New York (Kaiser Woodcraft Corp.)*, 11 N.Y.3d 353, 360 (2008); *Voorhees v.

McGinnis*, 48 N.Y. 278, 282 (1871); *Mastrangelo v. Manning*, 793 N.Y.S.2d 94, 95-96 (2d Dept.

2005).  Over time, however, the relative emphasis placed on each of these three criteria has

shifted.  In addition, different rules and presumptions have developed over time that depend on

the nature of the relationship between the person who has annexed personal property and the

owner of the real property.  As a result, "[a]n article, which remains all the time in the same

position and condition, may turn out to be real property as between some claimants, and, as

between others, personalty."  *Matter of City of NY (Allen St.)*, 256 N.Y. 236, 247 (1931); *see also*

*Voorhees v. McGinnis*, 48 N.Y. at  283-84 (describing different rules and different outcomes that apply depending on the nature of the parties' relationship).

Some of the evolution in the common law, and in New York law, was succinctly described by the Court of Claims in its decision in *Phipps v. State*, 69 Misc. 295, 296-97 (Ct. Claims 1910).  The first shift in the common law was the recognition that not all personal property located on real property should be treated as part of the real property itself, particularly where a tenant had made modifications to real property for the purpose of conducting a trade or business:

> In the early history of English jurisprudence there was no such thing as a fixture.  The relationship of the owner and occupier of the soil did not recognize it under the system of land tenures then prevailing.  The tenant was considered as a mere agent of the owner, and this relationship was not subject to contract.  Whatever the occupier placed upon the soil belonged to the owner.  But as society advanced and the commercial spirit developed, modifications crept in to protect the interests of those who made improvements upon land for purposes of trade or business.

*Id.* at 297.  The initial tendency was to focus on the manner in which personal property had been affixed to real property.  As the Court of Claims explained:

> The change from personalty to realty was determined by the manner and the extent to which property became attached to the freehold.  If it was firmly and permanently attached, so that its removal would injure the freehold, it was regarded as having changed its character from personal property and to have become a part of the realty.

*Id.*  Over time, however, commercial realities required further adaptations of the common law. For example, commercial tenants who conduct business in a leased space often affix large and heavy machinery to a leased building, while at the same time expressly reserving (in their leases) the tenants' ownership of that machinery and the tenants' right to remove the machinery at the end of the lease term.  New York courts recognized, in this particular context, that certain items that had been affixed to real property in a way that ordinarily would make them fixtures

nevertheless could still be treated as the personal property of a tenant. *Id*. at 297; *see also Mott v. Palmer*, 1 N.Y. at 578 (holding that a fence is an inherent part of real property and is deemed included in a sale of real property as between an owner and a buyer, but that an owner and a tenant may contract to treat the fence as property that the tenant may remove).

Another evolution in the law of fixtures was an increasing appreciation of the character of the relevant item and the purpose for which it had been affixed to the realty. *Phipps*, 69 Misc. at 297. In *Berliner v. Piqua Club Assn.*, 32 Misc. 470 (N.Y. Cty. 1900), for example, the court considered the question of whether certain electrical and gas chandeliers and other items in the Manhattan Athletic Club constituted fixtures, the title to which passed to the buyer upon a foreclosure sale. The court noted that "such part of the appliances in question as might be ornamental were designed in harmonious symmetry for the structure which was being erected" and that "all of the things so designed and planned were intended for permanent association with the building for the purposes in the indefinite future that the structure itself was intended to provide." *Id*. at 472. The court held that the suitability of these items for the intended uses of the real property was more important than the method of annexation in deciding whether the items were fixtures:

> The courts have advanced in the last half century from the inspection as to how firmly articles have been attached to the realty, in the ascertainment of whether they pass with it by conveyances, to the more important consideration of union in usefulness for the purposes of the structure and permanence of association.

*Id*. The specific design of the relevant items and their adaptation to the building was an objective indication of an intent that the relevant items would remain part of the building "so long as their utility remained, or for their life in the form of their construction." *Id.*

The last element identified in *Berliner* – the evident intent of the annexation – is the third (and now the most important) element that the New York courts have applied in determining

whether an item is a fixture. *Phipps,* 69 Misc. at 297. As early as 1869 the New York Court of Appeals recognized that "[t]he question of intention enters into and makes an element of each case. The circumstances are to be taken into account, to show whether the erections were made for the permanent improvement of the freehold, or for the temporary purposes of trade." *Potter v. Cromwell*, 40 N.Y. 287, 293 (1869). "Annexation" and "adaptability" are still relevant, but they now are primarily treated as factors to be considered in determining the "intent" with which an item has been attached to real property. *McRea v. Central Natl. Bank*, 66 N.Y. 489, 495 (1876); *Phipps*, 69 Misc. at 298-99.

The application of these evolving principles has proved to be challenging in some contexts. New York courts have struggled over the years with cases in which tenants have asserted ownership rights to items that otherwise would be considered to be fixtures, especially in connection with condemnation proceedings. *See, e.g., Ford v. Cobb*, 20 N.Y. 344, 350-51 (1859) (holding that certain items are so attached to the realty that they cannot be treated as personal property regardless of the agreements between landlord and tenant). New York courts have also struggled with cases in which sellers have retained chattel liens on goods that have been incorporated into real property but without payment and satisfaction of the liens. *See, e.g., Voorhees v. McGinnis,* 48 N.Y. 278; *Tifft v. Horton*, 53 N.Y. 377 (1873); *Fryatt & Campbell v. Sullivan County*, 5 Hill 116, 117-18, 1843 WL 4496 (N.Y. Sup 1843), *aff'd*, 7 Hill 529, 1844 WL 4557 (N.Y. Sup 1844) (seller of an engine and boiler could not foreclose on mortgage on chattels against purchaser of realty where the chattels had been installed so firmly that they could not be removed without destroying the building).

While cases involving tenants and lienholders have made for difficult decisions, the factors to be applied when an owner has attached personal property to real property are clear and less complicated.

First, some degree of annexation remains necessary before personal property may be considered to be a fixture. Originally the concept of "annexation" required that a chattel be "physically attached" to realty, "but that concept has been enlarged to include items that are 'constructively annexed' to the land." *Kaiser Woodcraft Corp.*, 11 N.Y.3d at 360. Accordingly, "[a] thing may be as firmly affixed to the land by gravitation as by clamps or cement." *Snedeker v. Warring*, 12 N.Y. 170, 175 (1854) (holding that a large statue and a sundial were fixtures).

Some items are physically incorporated into a building to such a degree that "the attributes of personal property cannot be predicated of the thing in controversy, as where the property could not be removed without practically destroying it, or where it or part of it is essential to the support of that to which it is attached." *De Bevoise v. Maple Ave. Const. Co.*, 228 N.Y. 496, 500 (N.Y. 1920). The fact that an item has been attached to real property in such a way that its removal would damage the item, or damage the real property, is a relevant factor to be considered in deciding whether the item was intended to be a permanent part of the property and therefore is a fixture. As the Court of Appeals explained in *McRea,* 66 N.Y. at 495-96:

> The mode of annexation may, it is true, in the absence of other proof of intent, be controlling. It may be in itself so inseparable and permanent as to render the article necessarily a part of the realty, and in case of less thorough annexation the mode of attachment may afford convincing evidence that the intention was that the attachment should be permanent; as, for instance, where the building is constructed expressly to receive the machine or other articles, and it could not be removed without material injury to the building, or where the article would be of no value except for use in that particular building, or could not be removed therefrom without being destroyed or greatly damaged. These are tests which have been frequently applied in determining whether the annexation was intended to be temporary or

> permanent, but they are not the only ones, nor is it indispensable that any of
> these conditions should exist.

On the other hand, the mere fact that an item could be removed without damage to the

real property is not itself a controlling fact. *Voorhees v. McGinnis*, 48 N.Y. at 282.  The

permanency of an item's attachment to real property "does not depend so much on the degree of

physical force with which the thing is attached as upon the motive and intention of the party in

attaching it." *McRea*, 66 N.Y. at 495.  As a result, removability "is not determinative in

separating compensable fixtures from noncompensable personalty." *Kaiser Woodcraft Corp.*, 11

N.Y.3d at 359.  If the requisite intention exists, even "slight annexation will be considered

sufficient to indicate an intention to transform the property from personalty to realty." *Phipps*,

69 Misc. at 298.

Second, "adaptability" contemplates a situation in which a particular item of personal

property is fitted to the particular design or purpose of the real property to which it is connected.

*Id*. at 360.  If an item of personal property has been specially crafted for a particular space, or if

the property itself has been specially constructed and/or designed so as to be adapted to the

personal property that has been attached to it, those are factors that suggest that the personal

property has been affixed with the intent of becoming a fixture. *Ward v. Kilpatrick*, 85 N.Y.

413, 419 (N.Y. 1881) (mirrors were fixtures where they "were fitted to the use and purpose for

which the part of the building they occupied was designed," where they were not merely free-

handing but instead "formed part of the inner wall," and where their "construction and finish was

made to correspond with the cabinet-work of the rooms."); *McRea ,* 66 N.Y. at 499-500

(machines that were located in a building that had been designed for that use as a twine factory,

and that had been adapted to that use, were fixtures).  Attached items that have been adapted to

conform to the specific decoration and style of real property are usually regarded as fixtures. *Berliner v. Piqua Club Assn.*, 32 Misc. at 472.

Items that have been specifically adapted to a particular building (or to which the building itself has been adapted) retain their character as fixtures even if they are, or can be, temporarily removed for cleaning, repair or for other reasons.  As the court explained in *Beardsley & Kirkland v. Ont. Bank*, 31 Barb. 619, 631, 1859 N.Y. App. Div. LEXIS 101 at *20-21 (Sup. Ct. 1859):

> A man may have the rafters, doors and windows made to fit precisely his house and the positions they are respectively to occupy and brought to the ground; but until actually put and affixed in and to the house, and thus made a part of it and the land upon which it stands, they remain personal property. When once attached, they may be removed for temporary purposes without destroying their character as a part of the realty."

Third, New York courts have made clear that an item is not a "fixture" unless it has been attached to real property with the intent that it be a permanent part of the real property. However, the words "permanent" and "intent" require further elaboration, as in this particular context those words do not have the meanings that they might have elsewhere.

"Permanency" does not mean indestructibility, as "indestructibility is not one of the essential attributes of real estate."  *Mott v. Palmer*, 1 N.Y. at 570.  As the New York Court of Appeals has explained:

> Fences are perishable by the effect of time, and so are trees and houses; but indestructibility is not one of the essential attributes of real estate.  Fences are not only indispensable to the enjoyment of real estate, but they are, in their nature, real estate, to the same extent that houses and other structures on the land are so. . . . A fence may be easily detached from the earth, but not more easily than the stones which lie on its surface, and both are part of the land, and therefore it is that a building or fence belonging to the owner of the land will pass by his deed of the land without being expressed or designated as part of the thing granted.

*Id.* As a result, fixtures are not limited to items that have the durability of the Egyptian pyramids. An item is still a fixture even if it might be replaced as the result of ordinary wear and tear or changing tastes. "The expression 'permanent' does not imply that the annexation must be intended to be perpetual, it being sufficient that it was contemplated that the article remain where fastened until worn out or superseded by another article more suitable to the purpose." *Troncillito v. Farm Family Mut. Ins. Co.*, 89 Misc 2d 844, 846 (Sup Ct 1977), *affd*, 63 AD2d 1042 (3d Dept 1978), *affd*, 47 NY2d 736 (1979); *see also Matter of Capri Marina & Pool Club v. Board of Assessors*, 84 Misc. 2d 1096, 1099 (Nassau Cty. 1976) (barge attached to a pier and used as a restaurant, while subject to a ten-year lease, had sufficient attributes of permanence to constitute a fixture).

There must be an intent to make something part of the real property, but in this regard "[t]he intent which is regarded as controlling is not the initial intention at the time the chattel is acquired nor the secret or subjective intention of the party making the attachment, but rather the intention which the law will deduce from all the circumstances." *Marine Midland Trust Co. of Binghamton v. Ahern*, 16 N.Y.S.2d 656, 659 (1939); *see also South Seas Yacht Club v. Board of Assessors & Bd. Of Assessment Review,* 136 A.D.2d 537, 538 (2d Dept. 1988) (a court must ascertain the intent of the affixing party "from the circumstances, rather than the subjective intent of the parties"); *Cosgrove v. Troescher*, 62 A.D. 123, 126 (1st Dept. 1901) (an owner's intent is "to be ascertained, not from his testimony as to what he intended nor from any undisclosed purpose or intent which he may have had, but from his acts and conduct, and all the surrounding facts and circumstances"); *Pfluger v. Carmichael*, 54 A.D. 153, 154 (2d Dept. 1900) ("Intention does not mean the undisclosed purpose, but the purpose as manifested by acts and the sound inferences therefrom").

Owners often attach personal property to realty "having no reflection as to the legal character of the structure, thinking nothing, and generally knowing nothing, and therefore having no special intent on the subject." *Voorhees v. McGinnis*, 48 N.Y. at 286. The ordinary rule is that personal property that an owner attaches to realty "will constitute the article annexed to be a part of the realty, when no different intention or purpose is manifested, and it is made for permanent use with the realty or with some building erected upon it . . ." *Potter v. Cromwell*, 40 N.Y. at 296. Tenants and vendors often reserve personal property rights in their leases and contracts, as described above. In the case of an owner, however, items that have been affixed to real property, with the intention that they will remain there for the foreseeable future, are presumed to be fixtures. *See Fisher v. Baronti*, 196 Misc. 2d 311, 312-13 (White Plains City Ct. May 23, 2003) (noting that "an intention to make a permanent accession to the property may be presumed where the annexer is the owner" but that "no such presumption necessarily arises where the annexer is a lessee."); *Matter of Mayor of City of N.Y.,* 39 App. Div. 589, 595 (1st Dept. 1899) ("Whatever has been put upon the land by the owner with the intention that it should remain upon the land and was essential to the use which he made of it, is, generally speaking, as between himself and his vendee, a fixture, and goes with the land when he shall sell it.")

## Discussion

Marianne Nestor Cassini has relied heavily on two arguments in contending that the disputed items should be treated as her personal property and not as fixtures that are part of the Townhouse. It makes sense to address those arguments separately before discussing the evidence relevant to each of the disputed items.

First, Ms. Nestor Cassini argues that in some sense all of the disputed items are "removable." She appears to be under the mistaken belief that an item can only be a "fixture" if

its separation from real property is a near impossibility.  As described above, however,

"removability" is not determinative under New York law.  Fixtures of all kinds can and

sometimes are removed and replaced when their useful lives have expired, or when tastes have

changed, or when cleaning or repairs are needed.  However, that does not mean that the items are

not "fixtures."  So long as items that would otherwise be personal property have been attached to

real property under circumstances that objectively show an intent to make them a lasting part of

the real property itself, they constitute fixtures, regardless of whether they could physically be

removed.

Second, Ms. Nestor Cassini has argued that some, but not all, of the disputed items were

treated as personal property when the Townhouse was purchased in February 1984.  *See* Closing

Documents, Trustee Ex. F.  She believes these documents are conclusive evidence as to whether

the covered items now are personal property or fixtures.  I disagree.

The Contract of Sale for the Townhouse, dated October 20, 1983, provided for the sale of

the Townhouse and all of the Seller's interests in "all fixtures and articles of personal property

attached or appurtenant to the Premises," excluding certain personal furnishings and movable

personal property.  *Id.*, Tab 1, § 1(c)(ii).  The total purchase price was to be $1,270,000.  *Id.* § 2.

The Contract of Sale did not itself identify any items to be treated as personal property or to be

sold separately.  However, the Closing Binder includes a separate agreement dated October 20,

1983, by which Marianne Nestor Cassini and Peggy Nestor agreed to purchase certain items that

had been appraised by Anton Rubert, Jr. at a price of $430,000.  *Id.*, Tab 19.[2]  The Closing

---

[2]    Ms. Nestor Cassini contends that she is the sole owner of these items.  The evidence shows
that she wrote the check for the items that were identified as "personalty."  However, the
contract of sale for those items is with both Ms. Nestor Cassini and the Debtor, and the Bill
of Sale vests title to the items jointly in Ms. Nestor Cassini and the Debtor, and not solely in
Ms. Nestor Cassini.

Binder described the overall transaction as a "Simultaneous Purchase" of the Townhouse and of "Fine Art, Furnishings and Other Personalty." *Id.* The seller also executed a Bill of Sale for the "personalty," and the value of the "personalty" was not included in calculating the real property transfer taxes that were due. *Id*. at Tab 20 and Tab 3.

The evidence shows that when the Nestor sisters bought the property the relevant items were already attached to the Townhouse. They had been attached by one or more of the prior owners (in some cases apparently by the original owners) and had been part of the Townhouse for many years. The items include doors, flooring, marble facings and other items that commonly are regarded as fixtures. The characterization of these items as personal property at the time of the sale appeared to have the primary purpose of limiting the real property transfer taxes that were payable upon the sale. Notwithstanding that tax treatment, there is no evidence that the then-current owner or the prior owners ever intended that the relevant items would be treated as anything other than permanent additions to the real property. The Closing Binder includes a copy of a letter dated October 26, 1983 to the New York State Department of Taxation and Finance, in which the relevant items were described as "certain paneling and Fine Arts acquired *as part and parcel of the real property* when the same was acquired." *Id*., Tab 22 (emphasis added). That language suggests that the prior owner had acquired the items are part of a real property purchase and not otherwise.

The evidence also shows that there were other items that were attached to the Townhouse at the time it was purchased and that were not designated as "personal property." Trial Tr., June 26, 2025, AP ECF 55, at 143:18-146:16. These items included other floorings, doors and wall facings that were of lesser value and that therefore were not on the list of appraised items that were included in the Bill of Sale. Ms. Nestor Cassini was evasive when asked about these, but it

is plain from the record that these items were all transferred to the Nestor sisters as part of the

real property in 1984, which is the way such items normally would be sold.

There also is no evidence that Marianne Nestor Cassini or Peggy Nestor ever intended to

treat the items as anything other than "permanent" additions to the real property, with the word

"permanent" having the meaning described in the New York case law as described above.  Ms.

Nestor Cassini stated herself, at trial, that she had no particular intent to remove the items:

> The property is removable, but when I purchased it, I wasn't particularly
> intending to remove it.  But if it belongs to me and I paid for it, it's my
> property.  I would say that rule goes beyond all the other statutes that Mr.
> Jared Borriello is stating.  I bought it.  It belongs to me.  Somebody wants to
> pay me fifteen, twenty-million dollars for it, I can think about it.

Tr. June 26, 2025 (AP ECF No. 55) at 40:3-9; *see also* Site Visit Tr., Ex. V, at 75:21-76:3 (when

asked if she intended that the installed fireplaces would remain where they were installed, Ms.

Nestor Cassini stated "I wasn't thinking about it.  We were just looking for beauty.")  Ms. Nestor

Cassini does not appear to want to remove the items even now; her main desire is to stop a sale

of the property, or to be paid for the installed items that she things are hers.  Dep. Tr., Ex. W, at

161:7-14, 253:12-255:25; Trial Tr., AP ECF No. 55 at 154:9-25.

Ms. Nestor Cassini believes that if she paid for certain items, and if they were treated as

personal property at the time of the purchase, that they must always be treated as personal

property and cannot ever be considered to be "fixtures."  However, all "fixtures" were personal

property at one time; that notion is inherent in the very definition of a "fixture."  Ms. Nestor

Cassini and Peggy Nestor may not have originally installed the items in the Townhouse, but the

fact that they have left the items attached to the Townhouse for more than forty years, with no

intent to remove them, is an objective indication of an intent that they be part of the Townhouse

as described in the governing New York authorities.

In fact, it is difficult to think of items that more are more customarily understood to be "fixtures" than the installed floorings, marble walls, wood paneling, doors, marble fireplaces and other items of the kind that are at issue in this case. I can only imagine the furor that would ensue if a buyer were to purchase a home and then, after closing, were to find that all of the flooring, wall facings, fireplaces and doors had been removed by the prior owner based on contentions that they were the prior owner's "personal property." All of these are items that are commonly understood to be "fixtures" that are part of the buildings in which they are found.

The character of the relevant items, and whether they are fixtures, is determined by application of the various factors identified by the New York courts, and not by the manner in which the items were treated for tax purposes when the Nestor sisters bought the property. As described more fully below, the manner in which the relevant items have been affixed to the property and have remained affixed to the property, and their specific adaptations to the uses of the property (or in some cases the adaptations of the property itself to the fixture), and the objective intent that is apparent from all of the relevant circumstances, overwhelmingly support the conclusion that the disputed items are fixtures.

### Findings and Conclusions as to Specific Items

The Trustee's Exhibit A lists 52 disputed items. (The numbers go up to number 54 so as to correspond to prior versions of the list, but no items are listed at numbers 5 and 19.) I have separately listed my factual findings and legal conclusions below as to each item on the disputed items list. In doing so I have grouped those items that are of similar character and as to which the reasons for my decisions are similar. I have relied not only on the testimony and other evidence offered at trial but also on the personal inspections that I conducted at the Townhouse.

1.      **Pair of Bronze Front Doors (Exhibit A, Item 1)**

The front entry to the Townhouse houses two bronze doors.  The Bill of Sale describes

them as follows:

> Cast & chased lappet-border frame.  Black iron grills of spindle-&-bud
> design over glazed panel.  Custom quality.  38" wide x 88" high.  Overdoor
> and frame to match.

Ex. F, Tab 20, at p. 1.  The Trustee's expert witness (Jared Sarnowski) offered the following

testimony regarding the design, dimensions, configuration and attachment of these doors:

> Each door measures approximately 38 inches in width by 88 inches in height
> and is accompanied by a matching overdoor and frame, all of evident custom
> fabrication and high artisanal quality.  The doors are permanently installed
> within a masonry opening at the primary entrance of the Townhouse,
> integrated into the façade and secured with structural anchoring systems. The
> frame and overdoor appear to be custom-fitted to both the dimensions and
> architectural detailing of the entryway, with finishes that align seamlessly
> with adjacent exterior materials.  Removal of the doors would require
> deconstruction of the surrounding masonry, finish surfaces, and threshold,
> resulting in substantial physical damage to the entry structure.  In our
> professional opinion, such removal would compromise the architectural
> integrity and security of the residence and would materially diminish its
> overall value due to the loss of a custom designed and installed, high-value
> feature that contributes significantly to the property's character and curb
> appeal.  The doors would be unusable at another location unless a custom
> opening/frame were created for them.

See Sarnowski Decl. ¶ 23.  No contrary evidence was offered, and all of Mr. Sarnowski's

findings and observations about the doors are consistent with (and verified by) the observations

that I made during the June 2025 site visit.

The evidence (including the dimensions of the doors) shows that the doors were custom

designed for this particular entry or that the entry itself was custom designed for these particular

doors.  The doors are of obvious importance to the function of the building as well as being of an

ornamental design that is, and obviously was intended to be, complementary to the design of the

building itself.  The frames for the bronze entry doors are affixed to the building securely and

they are attached to (and integrated with) other surrounding items in a manner that objectively

shows that their attachment to the building was intended to be permanent.  The doors and the

frames also are of a design that is complementary to the entry foyer, the inner doors and the wall

units that are described below in items 2 and 3, which also suggests that they were intended to be

a permanent part (with these other features) of the building entry.

Like any fixture, or like any other part of a building, the bronze front doors could be

removed or replaced if they were damaged or if a new owner desired to install something that

reflected a different taste.  In that sense, the entire entry to the building could be destroyed and

replaced with something completely different.  However, that is not the proper way in which to

determine whether the doors are "fixtures" under New York law.  The custom design of the

doors, their obvious adaptation to this particular building and use, their importance to the

building's function, the method of their attachment and their undisturbed long-term attachment

to the Townhouse are clear and objective evidence that the doors were attached to the

Townhouse with the intent that they be part of the building itself.

The bronze front doors were already part of the Townhouse when the Nestor sisters

purchased the property.  Dep. Tr., Ex. W, at 24:9-25:24.  The doors were listed on the Bill of

Sale as items that allegedly were transferred to the Nestor sisters as personal property.  However,

there is no evidence that the prior owners ever intended or believed that the attachment of the

doors would be only temporary, or that they would not be a part of the building that would be

transferred if and when the building were sold.  Nor is there any evidence that Marianne Nestor

Cassini or Peggy Nestor ever treated the doors as merely temporary adornments rather than as

fixtures.  Furthermore, there is nothing in the character of the doors, or in the method of their

attachment to the Townhouse, that justifies the parties' election, in 1984, to characterize them as

personal property as opposed to fixtures.  That characterization apparently was tax-motivated rather than being based on an accurate and disinterested assessment of whether the items were fixtures as a matter of New York law.

The history of the doors' attachment to the building, the design of the doors, the manner of their attachment, and the obvious configuration and design of the doors for this particular space (or the configuration of the space to correspond to these particular doors) all show objectively, and conclusively, that the bronze entry doors are fixtures.

**2.      Bronze Inner Doors (Exhibit A, Item 2)**

A vestibule at the entry to the Townhouse is framed by the outer bronze doors that are described in item 1, above, by two inner bronze doors (discussed here), and by two bronze side-wall units that are discussed in item 3, below.  The Bill of Sale describes the inner doors as follows:

> Foliate repeat design relief-border frame.  Glazed panel.  8"-0" high x 53" wide.  Inside surround and overdoor panel to match.  Custom design.

Ex. F, Tab 20, at p. 3.  The Trustee's expert witness testified as follows about the inner doors:

> The doors measure approximately 8 feet in height and 53 inches in width and include an interior surround and overdoor panel of matching custom design. These elements are permanently installed within a structural opening, with the frame and decorative components precisely fitted to the architectural contours of the adjoining space.  The craftmanship and scale reflect custom fabrication, designed to complement and enhance the interior design of the residence.  Removal of these doors would require disassembly of the integrated surround and overdoor, along with the disturbance of finished surfaces, embedded anchoring systems, and potentially adjacent structural framing.  In our professional opinion, such removal would result in substantial physical damage to the surrounding architecture, loss of original design integrity, and a material reduction to the value of the property due to the elimination of a distinctive and architecturally significant interior feature. The doors would be unusable at another location.

Sarnowski Decl. ¶ 24.  No contrary evidence was offered.  Mr. Sarnowski's conclusion that the doors would be "unusable" at another location is slightly overstated, as it is conceivable that a

custom-made space could be designed at another location that would house the doors. However, I agree that any alternative location would have to be customized for these particular doors. Mr. Sarnowski's other observations are consistent with (and verified by) the observations that I made during the June 2025 site visit.

The evidence (including the dimensions of the doors) shows that the doors were custom designed for this particular entry or that the entry itself was custom designed for these particular doors. The doors are, and obviously were intended to be, complementary to the design of the building itself. They are affixed to the building securely and they are attached to and integrated with other surrounding items in a manner that objectively shows that their attachment to the building was intended to be permanent. They also are of a design that is complementary to the entry foyer as a whole, which further shows that they were intended to be an integrated and permanent part of the building entry.

Of course, the bronze inner doors could be removed or replaced if they were damaged or if a new owner desired to install something that reflected a different taste. As noted above, the entire entry to the building could be destroyed and replaced with something completely different. However, that is not the proper way in which to determine whether the inner doors are "fixtures" under New York law. Fixtures and other items that constitute real property (including buildings) can and sometimes are replaced, restructured, or otherwise changed or removed, but that possibility is not what determines whether something is personal property or a fixture under New York law. Here, the custom design of the doors, their obvious adaptation to this particular space, the method of their attachment and their undisturbed long-term attachment to the Townhouse are clear and objective evidence that the doors were attached to the Townhouse with the intent that they be part of the building itself.

The bronze inner doors were already part of the Townhouse when the Nestor sisters purchased the property.  The doors were listed on the Bill of Sale as items that allegedly were transferred to the Nestor sisters as personal property.  However, there is no evidence that the prior owners ever intended or believed that the attachment of the inner doors would be only temporary, or that they would not be a part of the building that would be transferred if and when the building itself was sold.  Nor is there any evidence that Marianne Nestor Cassini or Peggy Nestor ever treated the doors as merely temporary adornments rather than as fixtures. Furthermore, there is nothing in the character of the doors, or in the method of their attachment to the Townhouse, that justifies the parties' election, in 1984, to characterize them as personal property as opposed to fixtures.  As described above, that characterization apparently was tax-motivated rather than being based on an accurate and disinterested assessment of whether the items were fixtures as a matter of New York law.

The history of the doors' attachment to the building, the design of the doors, the manner of their attachment, and the obvious configuration and design of the doors for this particular space (or the configuration of the space to correspond to these particular doors) all show objectively, and conclusively, that the inner bronze doors are fixtures.

### 3.    Bronze Side-Wall Units (Exhibit A, Item 3)

The third element that makes up the entry vestibule to the Townhouse are two bronze side-wall units.  They are bronze panels that form a curved entry space and that include glass panels that permit a view of the interior of the Townhouse.  The Bill of Sale describes the units as follows:

> Double-reeded 12-panel frames of straight and curvate form, fitted with conforming plate glass.  Custom quality.  Each unit: 66" wide x 100" high overall.

Ex. F, Tab 20, at p. 3.  The Trustee's expert witness offered the following testimony about the

side-wall units:

> The two side-wall window units match the construction and finish of the
> vestibule door and overdoor.  They are custom-fitted to both the dimensions
> and architectural detailing of curved kneewall and soffit framing.  Removal
> of these window assemblies would require deconstruction of the surrounding
> masonry, and finish surfaces, and threshold.  In our professional opinion,
> such removal would compromise the architectural integrity and would
> materially diminish its overall value due to the loss of a custom designed and
> installed feature.  The windows would be unusable at another location unless
> a custom-opening/frame were created for them.

*Id*. ¶ 32.  No contrary evidence was offered, and Mr. Sarnowski's findings and observations

about the two side-wall units are consistent with (and verified by) the observations that I made

during the June 2025 site visit.

The evidence (including the contours and dimensions of the side-wall units) shows that

the units were custom designed for this particular entry or that the vestibule itself was custom

designed for these particular units.  The units are, and obviously were intended to be,

complementary to the design of the other portions of the vestibule and of the building itself.  The

side-wall units are affixed to the building and to the surrounding portions of the vestibule in a

secure and permanent manner that objectively shows that their attachment to the building was

intended to be permanent.  The side-wall units also are of a design that is complementary to the

entry foyer as a whole, which further shows that they were intended to be an integrated and

permanent part of the building entry.

The side-wall units, like the two sets of doors discussed above, could be removed or

replaced if they were damaged, or if a new owner desired to install something that reflected a

different taste, or if the entire entry to the building were to be destroyed and replaced with

something else.  However, that is not the proper way in which to determine whether the units are

"fixtures" under New York law.  The custom design of the units, their obvious adaptation to this

particular space, the method of their attachment and their undisturbed long-term attachment to

the Townhouse are clear and objective evidence that the units were attached to the Townhouse

with the intent that they be part of the building itself.

 The bronze side-wall units were already part of the Townhouse when the Nestor sisters

purchased the property.  The doors were listed on the Bill of Sale as items that allegedly were

transferred to the Nestor sisters as personal property.  However, there is no evidence that the

prior owners ever intended or believed that the attachment of the side-wall units would be only

temporary, or that they would not be a part of the building that would be transferred if and when

the building itself was sold.  Nor is there any evidence that Marianne Nestor Cassini or Peggy

Nestor ever treated the units as merely temporary adornments rather than as fixtures.

Furthermore, there is nothing in the character of the units, or in the method of their attachment to

the Townhouse, that justifies the parties' election, in 1984, to characterize them as personal

property as opposed to fixtures.  As described above, that characterization apparently was tax-

motivated rather than being based on an accurate and disinterested assessment of whether the

items were fixtures as a matter of New York law.

 The history of the side-wall units' attachment to the building and the vestibule, their

customized nature, the manner of their attachment, and the obvious configuration and design of

the doors for this particular space (or the configuration of the space to correspond to these

particular doors) all show objectively, and conclusively, that the bronze side-wall units are

fixtures.  In fact, although I have discussed the various entry doors and side-wall units separately

(because they were listed that way), in fact they form a single integrated and custom-made entry

space.  *See* Site Visit Tr., Ex. V, at 4:22-6:17.  When considered as a combined feature it is even

more objectively apparent that they are not temporary installations and were instead intended to

be permanent features of the Townhouse, as the word "permanent" is used in the New York case law.

4.     **Italian Marble Wall Facing (Exhibit A, Item 4), Marble Inlaid Wall Facing Beneath Wainscot Rail (Exhibit A, Item 41), Peach Colored Marble Paneling (Exhibit A, Item 48), Green Marble Wall Covering Paneling (Exhibit A, Item 50) and other Marble Facings and Panels**

The Bill of Sale referred to two separate sections of marble wall facing located in the "First Floor Library."  One was a reference to approximately 260 square feet of "Italian Marble Wall Facing" that was further described as having "[b]lack and fleur-de-peche sections."  Ex. F, Tab 20, at p. 2.  The other was a "Marble Inlaid Wall Facing Beneath Wainscot Rail," which was further described as "In veined verte green panels within rouge-veined borders.  On all walls." *Id.*  The Trustee's list of disputed items has paired the same photograph with both of those disputed items.  *See* Ex. A, Tabs 4 and 41. It is plain in context that the photograph actually shows the marble that allegedly is made up of "veined verte green panels within rouge-veined borders."  Curiously, though, the Trustee's expert witness described this as follows:

> Although it appears to be marble, the lowest level of paneling around the perimeter of the Second Floor Library is a wall-covering/veneer over top of wood, and not real marble.  Like the wood paneling in this room, it is affixed to the wall assembly in a permanent nature without exposed fasteners.

Sarnowski Decl. ¶ 22.  I do not have a separate photograph of the other marble wall facing that was referenced in the Bill of Sale, and there was confusion during the site visit as to what item had been referred to.  However, in the course of the site visit I did inspect all marble wall facings and other marble shelves, vanities and attachments.

The wall facings that are listed in the Bill of Sale are disputed items, regardless of whether it turns out that they actually are made of marble or of some other material.  At many hearings Ms. Nestor's claims about "personal property" were limited to items that were listed on the Bill of Sale at the time of the purchase of the Townhouse.  During the site visit, however, Ms.

Nestor Cassini suggested that perhaps all of the marble wall facings and other marble counters

and vanities in the Townhouse should be treated as personal property.  No further evidence was

ever offered at trial as to the precise dates on which these other items were acquired, who paid

for them, or how and when they were installed at the Townhouse.  They include at least one

additional item that the Trustee has described as "Peach Colored Marble Paneling" in a third-

floor bathroom (Ex. A-48.)

> The Trustee's expert testified generally about all of the various marble items as follows:
>
>> Most of the bathrooms within the residence have been updated over the past
>> few decades including new plumbing fixtures, mechanical systems, lighting,
>> and marble finish at the floors and walls.  In some rooms, the marble has
>> been installed as built-in open shelving, and as the sink/vanity tops and
>> aprons.  The marble is cut and finished to the dimensions of the rooms that it
>> is installed in, or to the dimensions of the bathtubs that it surrounds.  In the
>> bathrooms, removal of the marble paneling would require removal of the
>> plumbing fixtures and associated trim, toilet accessories, and glass shower
>> partitions.  Its removal would require new finishes to be installed in the
>> bathrooms to meet code requirements and to leave a usable space.  Holes in
>> the marble from the items that are currently mounted to it, coupled with the
>> pieces custom-sized to fit the room, would render it unusable in its current
>> configuration.

Sarnowski Decl. ¶ 22.  No contrary evidence was offered.

My own inspection of the property showed that all of the marble wall facings had been

fastened in such a way as to conceal the method of attachment, and that the marble in each

instance had been cut and contoured to the dimensions of the spaces it was to occupy.  In each

instance the marble obviously had been chosen to correlate with other items in the relevant

rooms, including paneling.  The nature of the items, the manner in which they were attached,

their intended use and function, and their customized contours all showed objectively that they

were intended to be permanent parts of the real property and are fixtures.  It may well be that

some of the marble counters, shelves, wall facings and floors were installed by the Nestor sisters

as they renovated portions of the Townhouse in the years after its purchase.  Nevertheless, all of

the marble counters, shelves, wall facings and floors that I observed were obviously adapted to the uses to which they were put, contoured to fit the relevant spaces, and attached permanently in ways that made objectively clear that they all are fixtures under New York law.

5.    **Louis XIV 'Rossa Antica' Marble Mammoth Mantelpiece (Exhibit A, Item 6), Regence Marble Mantelpiece (Exhibit A, Item 12), Louis XVI White Statuary Marble & Gilt Bronze Mantelpiece (Exhibit A, Item 13), Third Floor-Bedroom (Back) Mantelpiece (Exhibit A, Item 20), Third Floor-Dressing Room Mantelpiece (Exhibit A, Item 21), Third Floor-Bathroom (Back) Mantelpiece (Exhibit A, Item 22), Louis XV Grey/Green Mottled Marble Mantelpiece (Exhibit A, Item 25), Directoire White Marble Mantelpiece (Exhibit A, Item 26), Fourth Floor-Sitting Room Mantelpiece (Exhibit A, Item 30), Marble Fireplace Facing (Exhibit A, Item 31), Fifth Floor-Sitting Room Mantelpiece (Exhibit A, Item 32), Sixth Floor-Bedroom Mantelpiece (Exhibit A, Item 33), Basement-Lower Level Mantelpiece (Exhibit A, Item 34)**

There are 13 attached mantelpieces and fireplace surrounds that Ms. Nestor Cassini contends are personal property that belong to her. Three of those (Items 6, 12 and 13 on Exhibit A) are items that were listed on the 1984 Bill of Sale. No evidence was offered to show the dates on which the other mantelpieces were acquired, whether they were parts of the original purchase of the Townhouse, who paid for them, or how and when they were installed. I therefore cannot tell whether these other mantelpieces were installed by the Nestor sisters after their acquisition of the property, or whether some or all of them may have been included with the Townhouse when it was purchased, without having been treated then as personal property. *See* Dep. Tr., Ex. W, at 205:11-206:7, 227:19-228:12 (testimony by Ms. Nestor Cassini that the sisters bought all of the fireplace mantels and surrounds in the building but that they may not all have been listed as personal property on the Bill of Sale).

The Trustee's expert witness offered the following testimony about the mantelpieces and fireplace surrounds:

> With the exception of one free-standing fireplace located in a construction area on the Second Floor (identified as the "Pantry" in the Floor Plan), all Fireplaces observed in the property appeared to be built-in, site-constructed

> units that are fully integrated into the architectural and structural framework
> of the building.  This includes framed or masonry enclosures, with custom
> millwork and marble finishes, including mantels and surrounds that are
> permanently affixed to adjacent wall structures.  In some instances, the
> construction of the Fireplace appears to be entirely built in place, such as
> with a custom marble firebox.  The chimney chases extend vertically through
> multiple floors and into the roof assembly, with visible connections to the
> building envelope.  Removal of the fireplaces would necessitate demolition
> of surrounding wall structures, disruption of finished surfaces, and
> penetration of the roof assembly, resulting in significant structural impact.  In
> our professional judgment, such removal would materially alter the design
> intent of the space, adversely affect the integrity of the building, and dimmish
> the overall value of the property.  The Fireplaces would be unusable as they
> currently exist, at another location due to their custom construction.

Sarnowski Decl. ¶ 19.  A footnote to the description of the "free-standing" fireplace states that

Mr. Sarnowski understands that the free-standing mantelpiece "is not a Disputed Item."  *Id.* n. 4.

Ms. Nestor Cassini offered evidence that fireplace surrounds may be purchased

separately, that it is possible to purchase mantelpieces and fireplace surrounds that have been

removed from other buildings.  However, all "fixtures" are items that at one time were personal

property.  Even the bricks from which a brick house is constructed were at one time personal

property, but they become real property once they become part of a building.  Similarly, the fact

that an item has been removed from another building does not mean it cannot be a "fixture"

when it is installed elsewhere.  Very few things are so immutable or immovable as to leave open

no possibility of change or relocation.  Even houses can be moved from one building lot to

another when the circumstances are right, but once the house is situated on its new property it

becomes part of that real property.  The question, in deciding whether an item is a fixture under

New York law, is not whether the item physically could be wrestled out of the building to which

it has been affixed.  Instead, the question is whether the circumstances show an intent that the

item has been attached to the building as a lasting way and with the intent to make it a part of the

building itself.

36

Mr. Sarnowski's testimony speaks of the "fireplaces" as a unit, including the fireboxes and the entireties of the constructed spaces by which smoke and gases are emitted from the building, and asserts that damage would be done if the fireplaces and their attached exhaust pipes and housings were to be removed.  Ms. Nestor Cassini has argued that the mantelpieces and fireplace surrounds can be separated from those other elements, and so the character of the mantelpieces and surrounds as "fixtures" or as "personal property" should not be based on the character of the other elements of the fireplace itself or on the damage that removals of those other components might cause.  I agree that the determination of whether the mantelpieces and surrounds are "fixtures" should not necessarily depend on the damage that might be caused if the fireplaces, chimneys and related items together all were to be removed.  However, mantelpieces and surrounds can be designed and attached in such a manner, and serve such a function, as objectively shows an intent that they be a permanent part of the fireplaces to which they have been attached and therefore of the building itself.  The question here is whether the design, function, method of attachment and other objective circumstances about the relevant mantelpieces and fireplace surrounds show such an intent.

After considering the evidence (including my own inspections), I can only conclude that the mantelpieces and fireplace surrounds are fixtures.  They were not merely attached in a temporary fashion; instead, they have all been attached in a manner that shows an intent to make them permanent parts of the building.  They have been fitted to the spaces they occupy, and those spaces have either been specifically built to house them or otherwise have been conformed to them.  The mantelpieces and fireplace surrounds serve important and not merely decorative functions (the remaining portions of the fireplaces would be unsightly and not usable if they

were removed).  Their adaptations to the building, their functions, and their integration into the surrounding structure all show that they are "permanent" parts of the property.

Ms. Nestor Cassini testified that one or more of the fireplace surrounds has been removed from time to time for repairs or for cleaning, but as discussed above that is not enough, under New York law, to change the character of an item as a "fixture."  Fixtures can be temporarily removed for repairs and cleaning but they still are "fixtures" under New York law.

As noted in Mr. Sarnowski's report, we observed one free-standing mantelpiece in the "pantry" area that was not attached to the building.  I understand that the Trustee does not contend that this item is a fixture.  I conclude that all of the attached mantelpieces and fireplace surrounds that are Disputed Items are "fixtures" under New York law.

### 6.    Regence Carved French Walnut Room Paneling (Exhibit A, Item 7)

One of the signature elements of the Townhouse is an oval-shaped paneled room that is located on the entry level to the Townhouse and that is described as the "Salon" in the Bill of Sale but identified as part of the Dining Room in other floorplans.  The Bill of Sale describes these as "Rococo foliate, scroll & pendant reliefs within moulded-edge lunettes over pairs of wall panels."  Ex. F, Tab 20, at p. 7.  The panels are ornately and beautifully carved.  These, and the wood paneling found in another room, are the items to which the highest values were ascribed in the Bill of Sale.

No definitive evidence was offered as to the origin of the oval paneling, but the parties seem to agree that the paneling is centuries old and that a prior owner (perhaps the original owner) had the paneling removed from an older property in France, transported to the United States and then installed in the Townhouse.  Ms. Nestor Cassini described the items as 15th

century carved panels during her deposition.  Dep. Tr., Ex. W, at 33:8-17, 34:13-18, 111:12-16, 118:5-8, 203:3-20.

I inspected these items, and the manner of their installation, during the site visit.  The panels have a curved shape and obviously were originally made for an oval-shaped room.  In the Townhouse, a wood-framed outline of an oval space was constructed in what otherwise would have been a rectangular space, and the panels then were affixed to the wood frame.  The wooden supports that make up the hidden frame extend from the floor to the ceiling and are securely attached to other parts of the floor and ceiling supports.  The result was to create an oval-shaped room, with the carved French walnut panels forming the walls of the oval-shaped room.

One or more of the panels was loose or had temporarily been removed and set aside to give access to other portions of the surrounding space.  However, it was quite plain that the entire space had been specially adapted to the shape of the paneling and for the display of the paneling.  The wood frames to which the panels are attached are themselves affixed securely to the building in a manner that shows an intent that they be permanent additions to the space.

It is true, as Ms. Nestor Cassini argued, that the paneling could be removed and that the room could be restored to its original rectangular shape.  It is correct, also, that the paneling is not structurally important to the room, in the sense that the removal of the panels would not affect the structural integrity of the building.  Once again, however, the mere ability to remove the paneling, or even the theoretical ability to reconstruct another oval wood-framed space for its use in another property, are not matters that determine whether the panels are fixtures under New York law.  Fixtures can be removed, destroyed or replaced by other fixtures if an owner wishes to do so, but they are still fixtures.  The facts that are relevant are the method of attachment, the extent to which the space has been adapted to the items, and whether the circumstances

objectively show an intent that the items were to be integrated and lasting additions to the real property itself, to be removed only when the items wear out or when changing tastes require a substitution.

The apparent age and provenance of the paneling, the elaborate adaptation of the room to contain and to showcase the panels, the manner in which they have been affixed, and their long and undisturbed presence in the Townhouse, all objectively show an intent that the panels would form a lasting part of the building and a "permanent" addition to the building as that term is used in the New York case law. They therefore are fixtures under New York law.

**7.     Various Interior Doors (Exhibit A, Items 8, 9, 15, 37, 44, 52)**

The parties have identified six sets of interior doors that are Disputed Items. Three of those (items 8, 9 and 15) refer to doors that were listed in the Bill of Sale. Two of these items (items 8 and 9) refer to doors that are part of the french paneling that is described in item 6, above. *See* Site Visit Tr., Ex. V, at 31:16-32:12. The other doors (items 37, 44 and 52) were not listed in the Bill of Sale, and no detailed evidence was offered as to how, when or by whom they were originally purchased and installed.

The Trustee's expert witness described the various sets of interior doors as follows:

> Both newer and historic doors exist throughout the residence, with a mix of swinging leaves and pocket style doors. All doors which are currently hung appear to fit and operate properly in their opening. Removal of the doors would necessitate replacement for maintaining the use of most of the spaces as they currently exist. While it is not uncommon for doors to be replaced in a residence, custom sized doors would need to be made for many openings throughout this residence due to opening dimensions. The openings referenced here are all custom door and in some cases are curved to match the shape of the room, include custom transom panels matching the framed opening dimensions, and include ornate trim which matches the adjacent wall trim throughout the space. Their removal could negatively affect the value of the residence due to their custom sizes and intricacies.

Sarnowski Decl. ¶ 25.  No contrary evidence was offered.  Ms. Nestor argued (as she argued

with respect to items) that the doors could be removed and that, in her view, they therefore

should be regarded as personal property.

I inspected each of the relevant sets of doors during the site inspection.  Ms. Nestor

Cassini admitted during the site visit that the "pocket doors" (item 37) were part of the building

when the Nestor sisters purchased it in 1984, and they were not listed as "personal property" on

the Bill of Sale.  Site Visit Tr., Ex. V, at 30:10-31:16.  As a result, they were treated as part of

the real property that was transferred in 1984.  The doors that listed as items 8 and 9 are part of

the paneled oval room: they are made of the same materials and conform to the same shapes.

There are hinges that permit them to be detached, but they are part of an integrated set of panels

that make up the entire room, and removing them would destroy the antique and customized

room as a whole, resulting in a reduction in the value of the paneled room.

All of the relevant doors and their frames are affixed to the building in a manner that

shows an intent that they be permanent parts of the interior of the building.  They serve important

functions (they separate the rooms for their intended uses) and were customized to the openings

in which they are present.  The doors and their surrounding spaces have been specifically

adapted to each other.  There is no evidence that suggests that they were intended to be

temporary or that they were not intended to be part of the building itself.  All of the evidence that

I observed, including the manner in which the doors are attached, their customized design, the

specific adaptations of the doors and surrounding spaces to each other, the functions they serve

and (in the case of items 8, 9 and 15) their long and undisturbed presence in the Townhouse, all

show objectively that they were intended to be lasting parts of the building and "permanent"

parts of the real property as that term is used in the New York case law.  They therefore are

fixtures under New York law.

**8.    Hardwood Flooring (Exhibit A, Items 10, 16, 17, 24, 38, 49, 51)**

The 1984 Bill of Sale identified 6 installations of parquet and other flooring as "personal"

property that was being separately sold to the Nestor sisters.  These appear as items 10, 16, 17,

24, 38 and 49 on the Disputed Items list.  Ms. Nestor Cassini has also contended that oak

hardwood parquet flooring in a fourth floor back bedroom is her personal property; that flooring

is listed as Item 51 on the disputed items list.  However, no evidence was offered as to how,

when or by whom the flooring that constitutes disputed item 51 was acquired or installed.

The Trustee's expert testified as follows about the hardwood flooring items:

> Removal of either the parquet flooring would necessitate removal and
> reinstallation of the perimeter wall base finish.  It is our professional opinion,
> such removal of the flooring would result in remedial work (new flooring to
> be installed) to maintain the usability of the various spaces.  Removal of the
> parquet and tile flooring would most likely render it unusable at another
> location due to the high probability of it being damaged in the removal
> process.

Sarnowski Decl. ¶ 26.

I inspected all of the disputed flooring items during our site visit.  In each case I observed

that the hardwood flooring had been affixed to the underlaying flooring in a manner that plainly

was intended to be permanent.  The surrounding walls and the floors were adapted to each other

and removal of the flooring would require reconstruction of the relevant spaces.  The flooring

obviously serves important functions in addition to being of appealing ornamental quality.  The

floors represent customized installations that are fitted to the spaces they occupy.

No evidence was offered to support the suggestion that the disputed flooring items should

properly be treated as "personal" property rather than as fixtures.  The Bill of Sale treated some

of the flooring in that manner, but there is nothing about the manner in which the items were

attached, or their function, that supported the characterization of them in the Bill of Sale. Their treatment as personal property in the 1984 transaction reflects an intention to reduce the real property transfer taxes that would be payable, rather than an accurate and disinterested assessment of whether the items were "fixtures" under New York law.

Like many other items, flooring can be ripped up and replaced if it no longer is serviceable or if someone wishes to install different flooring as a matter of taste. Under New York law, however, an item is considered to be "permanently" affixed to real property so long as the circumstances objectively show an intent that the item will remain so affixed until such time as its usefulness has expired or changing tastes prompt its replacement. That test is clearly met here. I conclude that all of the disputed hardwood flooring items are fixtures.

### 9.   Moulded Plaster Decorative Ceilings, Cove Mouldings and Other Decorative Plaster and Friezes (Exhibit A, Items 11, 14, 18, 27, 29, 39, 54)

Many rooms in the Townhouse include elaborately-designed plaster decorations that adorn the ceilings or walls and that form cornices. The Trustee's expert witness testified as follows about these items:

> Most wall and ceiling finishes consist of exposed plaster over masonry block or wood framed construction. The ornate plaster finishes throughout the various spaces cannot be cut out or removed and reused for its intended purpose as ceiling or wall finishes and trim, at another location. Removing the plaster would require extensive patching of walls and ceilings in nearly all rooms of the residence. Removal of these plaster finishes would result in a material reduction in the value of the property due to the elimination of a distinctive and architecturally significant interior feature. The plaster would crack upon removal and become unusable at another location.

Sarnowski Decl.¶ 27. No contrary evidence was offered, though Ms. Nestor Cassini contended that the plaster pieces were originally created off-site before being installed. Dep. Tr., Ex. W, at 169:20-170:24. She also contended, during the site visit, that someone could use a knife to cut out the plaster decorations. Site Visit Tr., Ex. V, at 36:2-14. However, it was apparent to me,

based on my inspection, that this was not the case. The plastic moldings and other decorations are integral parts of the walls and ceilings where they appear. Many of them are parts of long, large and interconnected decorations. They could not be removed without breaking them or tearing large holes in the spaces where they are located. One could try to imagine ways in which a skilled artisan could attempt to remove a few of the smaller ones by cutting along their outlines, but it is entirely unrealistic to suggest that anyone would or could do so. The plaster decorations are ornately designed to suit the various locations in which they are now located. They are affixed in the most permanent manner in which such items could be affixed.

Some of the plaster items were treated in 1984 as personal property that was transferred pursuant to the Bill of Sale. However, there is nothing about the fabrication, design, installation and use of these items that suggests that such treatment was appropriate. Everything about their design, appearance, function, installation and long presence in the Townhouse shows that they were intended to be permanent parts of the property. Like all other fixtures, they could be destroyed and replaced if one were inclined to redecorate the relevant rooms, but that does not mean they are not fixtures. They have been attached to the building with the obvious intent that they would remain there until either they wore out or changing tastes dictated their removal. That is enough to make them "permanent" additions to the real property under New York law.

**10.    Various Railings (Exhibit A, Items 23, 35, 36, 46, 53)**

The Bill of Sale included two bronze balustrade railings (item 23). Ms. Nestor Cassini has asserted that these are her personal property. She has also contended that various other sets of railings (items 35, 36, 46 and 53) were purchased and installed and should be treated as her personal property. No specific evidence was offered as to the dates and times of these installations, though Ms. Nestor Cassini testified at her deposition that she had the window

guards and front railings installed.  Dep. Tr., Ex. W,  at 25:10-27:8.  She also testified that she

had caused a staircase railing to be removed, repaired, and then reinstalled.

The Trustee's expert witness offered the following testimony as to the railings:

> The external iron railings in Exhibit A-23 are custom-fitted, permanently
> attached to the structure of the Townhouse and are integral to its design,
> safety, and use.  Removal of the railings would cause damage to the property
> or to the railings themselves. The railings in Exhibit A-35 are custom
> fabricated to fit the existing stone walls and stairs, in terms of opening width,
> curvature, and length.  They are attached without any exposed fasteners and
> may be partially soldered in place for final attachment.  Their removal would
> most likely necessitate repairs to the stone where attachment was made.
> Their removal would also pose a danger due to an open areaway that exists at
> grade.  The window railings in Exhibit A-36 are custom fabricated to fit the
> dimensions of the windows that exist.  These security railings do have
> exposed fasteners, but would necessitate patching of the cast stone façade at
> their attachment points, should they be removed, to prevent any water
> damage to the façade.  The railing in Exhibit A-53 appears to be a custom
> fabricated window rail, attached at the exterior of the residence.  Removal of
> this window railing would necessitate patching of the façade at its attachment
> points, should it be removed, to prevent any water damage to the façade.
>
> PCM also assessed the staircase railing in the Second Floor Landing (Exhibit
> A-46).  The staircase railings are custom-fitted, permanently attached to the
> structure of the Townhouse and are integral to its design and use.  Removal
> of the railing would cause damage to the property or to the railings
> themselves.  Their removal would result in a dangerous condition at the
> landing and necessitate patching of the stone floor where the rails are
> currently attached.

Sarnowski Decl. ¶¶ 29-30.

I inspected each of the relevant sets of railings.  Some of them serve as window guards.

Others serve as complementary decorations to the entry to the Townhouse.  Some (item 46) are

hand railings along an interior staircase that are not just ornamental but that also are designed to

prevent people from falling over the sides of the stairways.  The railings that were installed on

the outer part of the building are anchored into the stonework in a manner that obviously was

intended to be permanent.  Ms. Nestor Cassini acknowledged during the site visit that they were

designed to match the bronze entryway.  Site Visit Tr., Ev. V, at 10:4-6, 10:22-11:3.

Every one of the disputed railings is firmly and permanently affixed to the property.  The railings that were installed at the front of the building do not merely rest there; instead, they have been installed in a manner that obviously was intended to be permanent and not temporary.  Removal of the railings would likely damage the surrounding stone (in the case of the front entry) or other materials (in the case of the other railings).  The railings serve safety functions as well as decorative purposes.  They have been integrated into the property and have been designed using materials and styles that are harmonious with the rest of the building.  In short, they are fully integrated into the building itself, have been purposely designed in a manner that complements the building, and have been affixed in a way that suggests they were intended to stay in place.  The railings that were identified in the Bill of Sale apparently had already been in the Townhouse for many years and have continued in their then-current locations for the next 40 years, which underscores the objective intent that they would be permanent additions to the real property.

In arguing the contrary, Ms. Nestor Cassini once again relied on the notion that the railings could be removed or replaced if one were so inclined.  However, that does not mean they are not "fixtures" for the reasons I have explained many times above.  I conclude that all of the disputed items that constitute railings are fixtures under New York law.

**11.     Overmantel Mirrors and Other Installed Mirrors (Exhibit A, Items 28, 42, 45)**

The 1984 Bill of Sale identified one "overmantel mirror" in a fourth-floor bedroom (item 28) that was treated as personal property.  Ms. Nestor Cassini has also contended that one other mirror (item 42), and another set of five arch-shaped mirrors (item 45), should be treated as personal property that belongs to her.  Her deposition testimony identified some mirrors that

were installed in 2019 or 2020, but it is not completely clear which mirrors she was speaking

about at that time.  Dep. Tr., Ex. W, at 71:11-72:17, 110:15-111:2.

The Trustee's expert witness offered the following testimony about the disputed items

that are mirrors:

> The mirror [i]n Exhibit A-28 is adhered to the wall in a permanent manner
> without any exposed fasteners.  It is wrapped on three sides with wood trim
> that extends down the sides of the fireplace.  It has trim over top which is
> attached to the wall and causes a break in the wall molding.  Its removal
> would necessitate repairing damage caused to the wall and custom fabricating
> trim to match the void which would be left [i]n the wall molding.  The mirror
> in Exhibit A-42 appears to fit in the custom opening [i]n the wood wall
> paneling and attached without any exposed fasteners.  The mirrors in Exhibit
> A-45 have an appearance as if they are operable doors.  They are recessed
> within the wall finish as to not appear mounted on the wall.  Their removal
> would necessitate in-filling the void that would remain in the wall cavity.
> Throughout the residence there is extensive use of mirrors as built-in
> elements, attached in a permanent manner, versus a mirror that is hung on the
> wall for use and then removal.  Their age is a testament to the intended
> permanence that they have.

Sarnowski Decl. ¶ 28.

The mirrors at issue are not free-standing.  They do not merely hang on hooks.  Instead,

the relevant mirrors are fully integrated into the surrounding structures.  Items 28 and 42 are

encased in the decorative materials that form fireplace mantles and surrounds.  Those mirrors are

parts of the fireplace surrounds and are not separate from them.  The 5 mirrors that comprise

disputed item 45 similarly are encased in, and part of, the arched wooden structures that are built

into the walls.  They are a single unit with those wooden frames, and the wooden frames and

surrounding stone have been adapted and customized to fit each other.  They have been affixed

to the walls permanently and are not free-standing.

Although the "overmantel mirror" was treated as personal property at the time of the

1984 sale (apparently for real transfer tax purposes), there is nothing in the evidence presented to

me, or in my observations about the manner in which it is installed and the function it serves, that

supports that characterization.  All of the disputed mirrors are integrated into the building itself,

and they are attached in such a way and serve such a function that it is evident that they were

intended to be a "permanent" part of the Townhouse as that word is used in the New York case

law.  I therefore find that the disputed built-in mirror items are fixtures under New York law.

12.    **Carved Walnut Wall Paneling, Guilloche Frieze & Cornice Mouldings, and Corbel Brackets with Pendants (Exhibit A, Item 40)**

This Bill of Sale identified the wall paneling and associated cornice and frieze

decorations in a "library" room (one floor above the entry level) as some of the most valuable

parts of the "personal" property that allegedly was being sold.  The paneling is distinctive and

custom-fitted to the space.  The Trustee's expert witness testified as follows about this paneling:

> The wood paneling does not appear to have any exposed fasteners, which
> could permit its removal without damage.  There are lights, pictures, mirrors,
> and shelves attached to the face of the paneling throughout the room.
> Removal of the wood paneling and associated detailed trim, corbels, and
> crown molding would necessitate electricians for safe-off of light fixtures and
> likely result in damage to the wood paneling and trim, as well as adjacent
> ceiling plaster detail.  Removal of the wood components would most likely
> render [i]t unusable at another location.  The wood paneling adds significant
> value to the space due to its ornate and custom nature.

Sarnowski Decl. ¶ 28.  No contrary evidence was offered.

I inspected these items during the site visit.  The wood paneling is permanently affixed to

the walls and could not be removed except by prying it away from its current anchors.  The

paneling and associated cornices and friezes have been designed and installed so that they are

integrated with each other, with the result that none can be removed without likely damage to the

other integrated items.  The paneling is customized in size to the room and customized in design

to match the overall décor of the room.  The friezes and moldings and corbel brackets could not

be removed without likely resulting in damage to them.  Those items, like the paneling, were

installed in a manner that shows an intent that they would be permanent parts of the building.

As with other items, Ms. Nestor Cassini relied on the fact that these items were identified as personal property in the Bill of Sale. However, there is no evidence that supports the way in which the Bill of Sale characterized these items. To the contrary: everything about the design, method of attachment, customization for the space, integration of components, and long-standing presence of these items in this particular room shows plainly that these items were intended to be permanent installations and fixtures for purposes of New York law.

13.    **Two Green Side Tables (Exhibit A, Item 43)**

The "library" includes two marble-looking floating side tables that have been attached to the walls next to the fireplace. The Trustee's expert witness testified about these items as follows:

> The side-tables are painted to look like green marble. The side-tables are affixed to the marble wall paneling (Exhibit A-41). Removal of the side tables would result in damage to the underlying faux-marble wall finish which would need to be patched.

Sarnowski Decl ¶ 31. Ms. Nestor Cassini contended during the site visit that these two tables merely hang on the walls and can be lifted off. Site Visit Tr., Ex. V, at 53:9-54:20. The Trustee's expert witness said that they had pulled on the table and nothing had happened and that he doubted it could be removed without damage. *Id*. at 54:23-25, 55:6-7. Ms. Nestor Cassini acknowledged that the two tables had been custom made to match the wall finish. *Id*. at 55:1-5.

The evidence regarding the method of attachment of the side tables was inconclusive. However, they clearly are attached in some manner. The more convincing evidence is the fact that they were custom painted to match the surrounding walls. This custom finish, adapted to this particular location, is objective evidence that the tables were meant to be permanent parts of the walls, as the word "permanent" is used in the New York case law. I conclude that these are fixtures.

14.    **Cabinet with Wet Bar (Exhibit A, Item 47)**

Item 47 is an item that was not listed on the Bill of Sale but that Ms. Nestor Cassini

contends that she (or possibly she and her sister) installed.  The Trustee's expert witness testified

as follows about this item:

> The wet bar was enclosed with library/book façade cabinet doors.  Inside, the
> wet bar includes, among other things, a sink, a dish washer, and finish
> cabinetry.  Removal of the wet bar would necessitate extensive trade work
> including safe-off and removal of plumbing systems, safe-off and removal of
> electrical receptacles, and repairs to the walls that the wet bar cabinet is
> attached to.  This wet-bar is not simply a stand-alone assembly with a single
> point of connection, but a built-in component which would result [i]n damage
> to building systems and finishes should [i]t be removed.

Sarnowski Decl. ¶ 33.  No contrary evidence was offered.

I observed and inspected this unit during our site visit.  The wet bar consists of custom-

designed sinks, equipment and cabinetry that have been made to fit each other and to fit in the

particular part of the building in which they are installed.  They have been attached securely and

in a manner that shows an intent that they would be lasting parts of the building itself.  It is

conceivable that the wet bar could be wrestled from its current home, and conceivable that some

other building somewhere might have a space that could house these items (or that some other

building's interior could be customized to hold these items.)  However, that would just mean that

a fixture has been moved from one property to another.  That theoretical possibility does not

mean that the wet bar should currently be regarded as personal property and not as a fixture.  Its

function, its customized design and shape, its adaptation to this particular space and its method

of attachment all objectively show that the wet bar was intended to be a permanent addition to

the building and that it is a fixture under New York law.

15.    **Items Listed on Exhibit B**

Exhibit B lists 17 items that were listed on the 1984 Bill of Sale but could not be located by the parties.  (Exhibit B contains items that are numbered 1 through 24 but items 1-4, 9-10 and 22 have been left blank, apparently because items on a prior version of the list were later successfully identified.)  The items included in Exhibit B include flooring, doors, mouldings, corbel brackets, a mantel facing,  and other items of the same types as are discussed above.

Items 5, 6, 7, 8, 13, 14 and 15 on Exhibit B were located in areas of the Townhouse that have been remodeled or that were in the process of reconstruction.  To the extent that these items have actually been removed from the Townhouse as the result of prior renovations, and no longer are part of the Townhouse, they are not fixtures.  However, if they have been reinstalled elsewhere in the Townhouse they would be fixtures, for the same reasons that items of similar kind (identified above) constitute fixtures.  My personal inspection of the Townhouse, and of items of the type listed in Exhibit B, confirms this conclusion.

Other items listed on Exhibit B (items 11, 12, 16, 17, 18, 20, 21, 23 and 24) may well still be part of the Townhouse, but the descriptions of them in the Bill of Sale, and of their locations, made it difficult to identify them.  One such item (item 11) is described as "two bronze window balcony railings" in the second floor living room.  We could not be certain what this refers to, but all window railings that I observed in the Townhouse have decorative features that match the Townhouse as a whole.  They also serve safety functions and are securely fastened to the building.  The circumstances objectively show that all such window railings were intended to be permanent parts of the building.

Six other items listed on Exhibit B (items 12, 16, 17, 18, 20, 24) describe doors or wall panels, some of which are mirrored.  We could not identify the specific doors and wall panels

that correspond to the listed items.  However, all of the doors and wall panels in the Townhouse that I observed constitute fixtures for the reasons stated above.

One item listed in Exhibit B (item 21) is a fireplace mantel, and another item (item 23) is described as hardwood parquet flooring.  We could not be certain which fireplace mantel and which flooring these items were meant to describe.  However, I inspected all of the fireplace mantels and all of the flooring in the Townhouse, and for the reasons stated above all of the flooring and mantels that are presently in the Townhouse are fixtures, with the exception of the one freestanding mantel that is described above.

## Conclusion

For the foregoing reasons, I find that each of the disputed items listed on Trustee Exhibit A constitutes a fixture under New York law and is part of the real property at 15 East 63d Street, New York, New York, and that the items listed on Trustee Exhibit B (to the extent they still are located in the Townhouse) are fixtures.  For the avoidance of doubt, all of the doors, flooring, wooden paneling, marble facings, bronze side wall units, interior doors, window brackets, railings, mouldings, corbels, and fireplace mantels and surrounds presently located in the Townhouse are fixtures, with the exception of the freestanding fireplace that is presently located in the area described on the floor plans as the butler's pantry.  A separate Judgment will be entered to confirm the Court's determinations.

Dated: New York, New York
         August 13, 2025

/s/ **Michael E. Wiles**
HONORABLE MICHAEL E. WILES
UNITED STATES BANKRUPTCY JUDGE